UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No:  22-cr-20296-JEM


UNITED STATES OF AMERICA,

        Plaintiff,                              Miami, Florida
                                     November 28, 2022
  v.                                Pages 1-31
                                   1:35 – 2:19 p.m.

JOSHUA DAVID NICHOLAS,

        Defendant.
_____

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:  Sara Hallmark, A.U.S.A.
                     Kevin Lowell, A.U.S.A.
                     United States Department of Justice
                     Fraud Section, Criminal Division
                     1400 New York Avenue N.W.
                     Washington, DC, 20530


For the Defendant:  Julie Holt, A.F.P.D.
                     Micki Bloom, A.F.P.D.
                     Office of the federal Public Defender
                     150 West Flagler Street, Suite 1700
                     Miami, FL 33130


Also Present:       Dianne Valdez, US Probation Officer


Reported by:        Dawn M. Savino, RPR, CRR
                     Official United States Court Reporter
                     111 North Adams Street
                     Tallahassee, Florida 32301
                     (850) 521-3674
                     Dawn_Savino@flnd.uscourts.gov


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

(Court called to order)

COURTROOM DEPUTY:  Calling case 22-CR-20296, United States of America versus Joshua David Nicholas.

Counsel, announce your name for the record, starting with the government.

MS. HALLMARK:  Good afternoon, Your Honor.  Sara Hallmark and Kevin Lowell on behalf of the United States.

THE COURT:  Good afternoon.

MS. HOLT:  Good afternoon, Judge.  Julie Holt and Micki Bloom on behalf of Josh Nicholas.

THE COURT:  Good afternoon.

Mr. Nicholas is present, correct?

MS. HOLT:  Yes, Your Honor.

THE COURT:  All right.  We're here on a sentencing.

Can I get an appearance from probation.

PROBATION OFFICER:  Good afternoon, Your Honor.  Officer Dianne Valdez with probation.

THE COURT:  Ms. Valdez.  All right.  We're here.  I've reviewed -- on a sentencing.  I've reviewed the indictment, the plea agreement, the report and recommendation and order adopting R&R.  I'd like the record to reflect if it is true, that the plea was held before a magistrate judge due to my unavailability.  I don't remember if it was trial or I was out of town, and therefore it was the convenience to the parties.

Is that correct, Madam Prosecutor?

MS. HALLMARK:  Yes, Your Honor.

THE COURT:  Defense?

MS. HOLT:  Yes, Judge.

THE COURT:  Okay.

I've reviewed the presentence investigation.  Note that the defendant requests designation to a facility as close to South Florida as possible.  I will grant that.  If I don't mention it again, it will be in my formal order.

I have reviewed the addendum to the PSI and the defendant's objections to the PSI.

Ms. Holt, if there are objections that have not been resolved to your satisfaction, please raise them now or I'll consider them to be waived.

MS. HOLT:  Yes, Your Honor.  Thank you.

The one -- it appears that the factual objections e-mailed to probation have been resolved.  However, I would just ask that the Court order probation to put those factual changes into the body of the PSI as oftentimes BOP does not get the addendum or does not consider it to be part of the PSI.  And so, we would be solely incorrect facts.

THE COURT:  I got to tell you, for me to tell BOP what to consider and what not to consider would be like me telling GSA how to maintain this building.  It would be a very wasted effort on my part. I do understand what you're saying.  I think that probation does it however it is they do it.  But Ms. Valdez, if you can incorporate

those into the body, then please do so.  Because it does make sense that BOP might not notice or might ignore it.

Yes.  What else?

MS. HOLT:  Thank you, Judge.  The remaining objection is an objection to probation not awarding Mr. Nicholas a three-level reduction for accepting responsibility.

THE COURT:  Okay.  Now, that's due to the fact that he was arrested on another matter --

MS. HOLT:  Correct, Judge.

THE COURT:  -- that was not related to this matter.  Is that correct.

MS. HOLT:  Yes.

THE COURT:  And it was for a conduct that took place before his plea, but he was actually arrested -- was he arrested before his plea in this case?

MS. HOLT:  Yes, Your Honor.

THE COURT:  Okay.  Then why is that not -- I don't know.  Let me ask Ms. Holt, what's your position -- no, I'm sorry.  Madam Prosecutor, what is your position on that?

MS. HALLMARK:  We would agree that Mr. Nicholas is entitled to a three-level reduction for acceptance of responsibility.

THE COURT:  That still doesn't reduce the fact that it's going to be 60 months, because it was 91 to something.

MS. HALLMARK:  Yes, Your Honor.

THE COURT:  Right?  So it doesn't affect anything, does it

Ms. Holt?  Does it affect anything?

MS. HOLT:  Ultimately the guidelines would be the same 60 months, Your Honor.

THE COURT:  Yeah.  Gee, I got better things to do than deal with this.

What's the difference, Ms. Valdez?  If he gets acceptance of responsibility, what are the guidelines?

PROBATION OFFICER:  Your Honor, his total offense level currently is a 30, so his guideline range would still have been more than what was recommended.

THE COURT:  More than 60 months.

PROBATION OFFICER:  70 to 87 months.

THE COURT:  Yeah.  I'll grant your motion, and the guidelines therefore are 70 to 80 months?  Is that what you said, Ms. Valdez?

PROBATION OFFICER:  With the updated guideline range of 27 and a criminal history category of one, his guideline range would be 70 to 87 months.

THE COURT:  70 to 87 months, Which is above the statutory maximum of 60 months.  So big deal.  Go ahead.

What else you got?

MS. HOLT:  That's the final objection, Your Honor.  Just argument.

THE COURT:  All right.  I'm ready to proceed at this time. Let me hear from the government.

6

The government has issued a motion for -- under 5K1.1?

MS. HALLMARK:  That's correct.

THE COURT:  For a reduction of sentence of 15% from the 60 months which is nine months, which brings it down to 51 months; is that correct?

MS. HALLMARK:  Yes, Your Honor.

THE COURT:  I'm a little bit troubled about that because the fact is that this offense, even with the receiving acceptance of responsibility, is well above the 60-month maximum which the government agreed to.  So now we're at the 60-month maximum because he took a plea to something that has a cap that is lower than his guidelines, and we have a motion for reduction, not from what the guidelines are, but from what the maximum is.

I'll grant your motion for reduction.  I understand it. I'm not sure that I will give him a reduction from the 60 months, but I will happy to hear what you believe is an appropriate sentence and what the defense appears is an appropriate sentence.

MS. HALLMARK:  Yes, Your Honor.  Thank you.

Your Honor, based on the 3553(a) factors, the government recommended a sentence of 51 months imprisonment, a three-year term of supervised release, and restitution and forfeiture as a sentence sufficient, but no greater than necessary in this case.

Your Honor, we'll primarily rest on our papers, but wanted to point out a few points in particular to the Court.

THE COURT:  Go ahead.

MS. HALLMARK:  Your Honor, as an initial matter it is evident from the PSR and the defendant's memo that Mr. Nicholas feels remorseful for his crime, and that he has gone above and beyond even the face of great legal risk to try and undo the harm that he caused. However, the fact remains that he helped orchestrate a more than a year-long multi-dimensional Ponzi scheme leaving hundreds, if not thousands, of trusting investors with significant financial loss. This was not a theoretical harm, he cannot undo it, and he should be held accountable for his part of it.

Blockchain tracing in this case found a loss of over $40 million in investor money, and the government continues to receive victim impact statements from around the world.  We provided nearly 200 of these statements to date to the US Probation Office which detailed the devastation that investors encountered as a result of the defendant's scheme.

It sounds like Mr. Nicholas himself has gone through a hardship that no person should endure, and understandably one of financial stability and success.  However, as in all cases, there's a right way and a wrong way to do something and in this case he chose a path that led to massive harm.

The defendant also claims that if it wasn't him, his co-conspirators would have just found someone else.  But the fact is that it was him, he did do it, and his lies and deceit were a critical element of what enticed investors to EmpiresX and lulled them into believing that the opportunity was legitimate.

The nature and circumstances of the defendant's offense alone warrant a significant period of incarceration, as is the need to reflect the seriousness of the conduct, to promote respect for the law, and provide just punishment.

THE COURT: So why did you allow him to plead to a 60-month maximum when the guidelines, even now, are above that?

MS. HALLMARK: Your Honor, that was part of our plea negotiation with the defendant. We believe it was in the interests of justice to move this case along, and as you've noted, as referenced in our sealed motion, we believe that the defendant had significant information relevant to the government's case and believed it would be in the government's best interest.

THE COURT: But you don't even have the other dude. The other guys all ran off, didn't they?

MS. HALLMARK: That's right. We believe they are in fugitive status at this time.

THE COURT: So you have a major fraud with a couple of hundred victims, a couple of hundred million dollars lost, and you're letting him plead to a lesser offense, and then you're giving him a reduction from that.

That sounds awfully lazy to me. I mean, I've been in your position, I've negotiated pleas. This seems like a cop-out. Like if you can't prove the case, don't bring it. If you can prove the case, don't compromise. It makes no sense to me at all. This is really shoddy prosecution in my opinion, not worthy of what I consider to be

the valuable US Attorney's Office and a competent US Attorney's Office. I'm very, very troubled by this.

All right. Are you done?

MS. HALLMARK: Your Honor, I would note that there is also the value of general deterrence which we believe would be accomplished in this case with a --

THE COURT: It probably would be accomplished a lot more if you made him -- if you made him plead to the appropriate crime. I understand that, but it seems to me that you're diminishing virtually every one of your arguments with the deal you made.

All right. Let me hear from the defense.

MS. HOLT: Thank you, Your Honor. I understand the Court's position, but I think there are a few facts in this case that take this out of the normal guideline.

THE COURT: I'd sure like to hear them.

MS. HOLT: We're asking Your Honor for a sentence of 12 months. I think -- let me go through, and then I will elaborate the factors here that I think, like I said, take this out of a standard case and what it looks like on its face.

First, Your Honor, there is his cooperation.

Secondly, his extremely abusive childhood that helps give context to how he got involved in this crime.

Third, his relatively limited involvement compared with the two co-defendants who are still at large.

Four, that there are other forms of punishment that he will

receive in this case beyond just a prison sentence, and finally to avoid unwarranted sentencing disparities.

THE COURT:  With who?  Unwarranted disparity with who?

MS. HOLT:  Your Honor, as filed in my sentencing memorandum, I included as an exhibit a table of significant fraud cases and the sentences along with the guidelines that the defendants received in those cases, and I think there are many that I included --

THE COURT:  Not in this case.

MS. HOLT:  Not in this case, no, Your Honor.  In other cases.

THE COURT:  Okay.  Yeah, I saw them.  I really think that every case is very different.  But I did understand, I understand your argument.  Go ahead.

MS. HOLT:  I agree, Your Honor, that cases are different. But when we're looking at loss amount which very much drives the guidelines in cases like this, and whether someone accepted responsibility, it seems an unwarranted disparity where someone with a loss amount ten times what we have here and who went to trial is getting a sentence of 12 months and a day, where Mr. Nicholas, who has shown an extraordinary acceptance of responsibility and has a much lower loss amount would be getting something higher.

But I want to start, Your Honor, with the cooperation and with his extraordinary acceptance of responsibility, because I do think that are the primary things that pull this out of a regular

case.

First, just to sort of go through what he did as part of his cooperation --

THE COURT:  Let me just interrupt you.  There's no question he wasn't the kingpin, but he was a linchpin.  Without him, or somebody else in his position, this wouldn't have worked, would it?

MS. HOLT:  I think it would have, Your Honor.  I think --

THE COURT:  Who would they have had spewing the nonsense that they were making a gazillion dollars and that they were paying $10 million out in profits every month.  They would have had to have somebody say that, wouldn't they?

MS. HOLT:  Both of the co-defendants were primarily the ones who said that.

THE COURT:  They obviously already felt that they were not credible or they wouldn't have had to hire him.  Why did they need him?

MS. HOLT:  Your Honor, I'm not saying that Mr. Nicholas did not participate and that his involvement did not assist the scheme in going forward, but certainly the co-defendants had started EmpiresX and were already collecting money prior to Mr. Nicholas getting involved with them or even meeting them.

THE COURT:  The co-defendants that have split.

MS. HOLT:  Exactly, Your Honor.

THE COURT:  Okay.

MS. HOLT:  So while I don't agree with the government that

he was the linchpin, he certainly -- again, his conduct is serious and he certainly contributed to the success of their scheme, but without him the co-defendants would have found someone else if they wanted, and they certainly were the ones who, in these videos of the Zoom meetings with the investors, they were the ones talking about the money being returned, they were the ones talking about the pyramid part of the scheme.  Mr. Nicholas was there talking about the trades he was doing with the interactive brokers account and the market.  So yes, he gave the sense of legitimacy, but he was hired and acted as at their behest.  And I think what is important and what his -- what sort of exhibits more clearly his role is what he didn't have access to, for example.  That he did not have access to these crypto wallets that -- where the investors' money was coming in, he did not have access to this --

THE COURT:  And going out.

MS. HOLT:  And going out.  Exactly, Your Honor.  He was paid -- the money that he received for his role, he was paid from the other two co-defendants to his wallet.  So the fact that he did not have access to those accounts, that he did not have access to investors' money, that he did not have access to the back office website where the investors could go on and look at their money and see what was allegedly coming in and out and what they were earning shows his relatively minor role in this compared to his co-defendants.          When you also look at the amount that he made, which is approximately 268,000 compared with this 40 million

loss that presumably two co-defendants have taken and are who knows where with at this point, you can see how Mr. Nicholas felt or what his role was in this scheme, and it was not a linchpin.  It was someone that they hired to say do X, Y and Z, and he did it.  If it were not him, it would be someone else they would hire, or they would pretend to do it on their own.  It's hard to say.  But they certainly were doing this before they met Mr. Nicholas, and they were the ones that had access to all the finances.

Your Honor, with respect to the cooperation, there were three debriefs.  They were with the prosecutors here today, and also -- and the agent of course, but they were also with the folks from the SEC and folks from the CFTC.  I think one of the things that sets Mr. Nicholas apart is that at that time he had pled guilty and he had worked out an agreement with the SEC, but he had not worked out an agreement with the CFTC.  When we started the debrief and they were there, I asked them if they would abide by the same conditions in debriefs as DOJ does which is they're not going to use it against him in any future case, and they said no, which is their right.  And so I talked to Mr. Nicholas about that and told him the risks, and he said without hesitation I'm doing it, I want them to have the information.  So initially, without any agreement with the CFTC, he was willing to continue to go forward and speak.

During the debriefs he shared his screen with the government and the regulatory agencies to walk them through accounts and documents.  After the first debrief, he sent or resent the

government his entire WhatsApp chat history with the two co-defendants over the entire period of their -- of his involvement or contact with them.  That is something, due to WhatsApp encryption, at least by my understanding, that the government would never have had without Mr. Nicholas' cooperation.  And it wasn't just the chats that we sent them, but every single attachment.  Those attachments included documents that they were creating for EmpiresX going back and forth, and they also included audio recordings that the co-defendants had left Mr. Nicholas in which they're discussing the conspiracy.  So again, these are all things that the government would not have had without Mr. Nicholas' cooperation.

He also sent them an 18-page detailed time line of his involvement and what he knew about EmpiresX, along with exhibits.  He included text messages with two of the top recruiters or investors to sort of give context to what was going on with them once the SEC investigation had started and he -- Mr. Nicholas was trying to figure out who the co-defendants had actually paid back.

They included screenshots of the flights the co-defendants purchased for Mr. Nicholas trying to pressure him to flee to Brazil after the SEC investigation came to light.  It showed that they at least, at the time, were in Florianópolis, Brazil.

He sent the government screenshots of an Uber ride from an Airbnb run by one of the co-defendants in LA to show look, this is an address where you have some connection to one of the co-defendants.

He identified one of the FamX accounts that the government

had not yet identified. He identified it as his own. And through that he walked the government through every transaction in there, and then through that they were able to identify a much larger FamX account and who that belonged to.

Related to this, Your Honor, I think is his extraordinary acceptance of responsibility in other ways, not just his formal official cooperation with the government. First, he did not flee when given the opportunity and pressure by the co-defendants, and that may seem very basic, but we obviously know that the two co-defendants did flee and Mr. Nicholas at that time chose not to. He chose to stay and to face responsibility for his actions in this case.

Then once the SEC and CFTC investigations came to light, he actually tried to assist them without any agreement with them about what sanctions or punishments would follow.

He tried twice to give them information about the whereabouts of the co-defendants, but was dissuaded by his lawyer at the time. He initially took the 5th in his interview with the CFTC based on advice of counsel, but within a few days of doing that personally e-mailed the CFTC and said I don't want to do that, I want to help you out. Who then CFTC contacted his lawyer and said we got this communication, and his lawyer, once again, dissuaded him from providing that information to the CFTC. I think these are extraordinary actions for someone who knows he is facing severe punishments and potentially criminal sanctions as well.

Even after he was arrested in the criminal case he still reached out to the SEC and said I want to help. What do we do going forward. I want to be as proactive as possible. He wanted to send them the time line, he wanted to send them the documents that he had been collecting over these months. He has shown time and time again, after -- once this came down and once these investigations came to light, and Mr. Nicholas realized what he had done, he showed time and time again that he put the victims over himself. He was facing risks, financial risks and risks to his very liberty, and yet chose, without any agreement, to do what he could to help them to try and get as much money returned to the victims as possible.

And one thing I think is very significant is he reached out to the plaintiff's counsel in the state class action case that had been filed against EmpiresX, the co-defendants and himself, reached out and said I want to help. This was against my advice, I will be honest as his criminal lawyer, but he politely said I'm not going to do that, I want to help them.

And Adam Moskowitz, the Plaintiff's counsel from that case is here and will give more detail to what Mr. Nicholas did and how he was able to help them get more assets into their receivership, and help them to be able to actually have a chance of returning significant assets to the victims in this case, Your Honor. And I think that's huge. This is something that Mr. Nicholas did before he had signed a plea agreement. This is something he did before he had any knowledge about what was going to happen to him, and that's

exactly what I advised him.  Look, if you talk to them, all of this can be used against you and he said -- he put the victims first at that point.

Your Honor, I think those things are very significant and pull this case out of a situation in which someone simply agrees to plead guilty or agrees to formally cooperate with government.

I think his background and characteristics also not give an excuse, but give context as to how he got involved in this. Mr. Nicholas suffered extreme emotional and physical abuse throughout his childhood and his teenage years from both of his parents.  There were violent outbursts.  There were sadistic disciplinary methods. They isolated him and his siblings by home schooling them and not allowing them to go to school in part because they were covered in bruises and cuts from the abuse, but in part because it would give them access to some sort of outsider.  They were worried they would have this secular influence in their life.

Your Honor, there are -- some of the things that Mr. Nicholas endured were being pulled out of bed in the middle of the night, thrown on the floor, back-handed if they didn't properly clean the house, or if they made a mess, which kids always do.

One time he struggled with a homework assignment in math and his dad made him do math all throughout the night, smacking him in the head and calling him a dumbass if he made an error.

They were made to memorize hundreds of Bible verses.  If they failed to do this, their dad would take them into the bedroom,

make them put their hands on the bed, shove dirty clothes in their mouths and beat them.  If they screamed, if they resisted, they would just get more lashings.

Mr. Nicholas' father was not the only abusive parent, and by Mr. Nicholas' and his brother's account, their mother was even more severe.  She was unpredictable.  She would have outbursts for no reason whatsoever.  Their memories were she would chase them around the house with a spatula, and sometimes knives when they attempted to get away.  Mr. Nicholas' brother recalls that's she would threaten to kill them often, and giving -- and would give specific ways of how she was going to do it like drowning them in the bathtub.

While this doesn't excuse it, I think it gives some context to how he got into this situation in the first place, Your Honor.  He was never given any treatment to deal with this.  Instead, he became an incredibly goal-oriented, focused person to try and make sure he was never in such a powerless situation again.  And to that -- and to Mr. Nicholas, that meant making money, having financial security.

For the most part he did this throughout his life in laudable and productive ways.  He put himself through undergrad and grad school.  He had jobs.  He worked at the Bonner Group in Chicago.  But this past didn't escape him.  He still had this.  So when he met the co-defendants, this past sort of, and during this time, came back to him in ways that he still had this inability to -- or these imperfect decision-making skills based on this trauma that he had experienced as a child, and then this goal-oriented focus on how can

I establish safety for myself. And for him that meant making money.

He believed then once he got involved in the scheme that he could trade his way and the investors' way to wealth. Again, his conduct is inexcusable, but I don't think and I don't think the discovery plays out that his intention was to pilfer everyone's money, but instead he believed, perhaps unrealistically so, that he could, no matter what they told them, make money for himself and for everyone by trading stock.

Your Honor, I think also telling of Mr. Nicholas and the person he was and the person he will be again are the letters attached to the sentencing memo. I think it speaks really highly of what kind of person he is to the people around him. The letter from his track coach is, I think, very significant. That was years ago, but still he remembers Mr. Nicholas in such a good light as to write a letter on his behalf. He reports that he was an excellent student and also an outstanding student athlete and very good person. He says his real strengths are personality, character and integrity. He was a great team leader, motivator and disciplinarian while always leading by example.

I think also significant for similar and also different reasons is the letter from Anthony Damaco from Uncle Tony's U-Pull-It, which says Mr. Nicholas helped him and his nephew get out from financial limitations and grow the business. Mr. Damaco trusted Mr. Nicholas with a lot of their financial information, and I think this shows that Mr. Nicholas is not someone who, no matter what this

Court does, is going to go out and commit new crimes, but that he's someone with integrity who has shown in the past that even when given all of this sensitive financial information it doesn't mean that he steals it or commits some sort of fraud, but he instead helped Mr. Damaco and his nephew get out of financial trouble and became someone that they trusted wholeheartedly with their finances in the company.

The letter from his colleague at Bonner Group, I think, is also significant to show Mr. Nicholas' work ethic, and his integrity as an employee.  When they said that the manager for the project that Mr. Nicholas worked on spoke glowingly about Josh's work and requested that he be assigned to all future joint projects.

There are other letters I won't repeat here, but I know Your Honor has seen them.

I think these characteristics, along with his history also warrant a sentence of 12 months in this case.

We've already gone over, like I said, his relative small compensation and relative conduct in this case compared with the co-defendants', but that is something I think that is significant here as well.  I think here a lengthy prison sentence is not required for deterrence, either specific or general.  You know, the DOJ has put out guidance saying the certainty of being caught is vastly more powerful than the actual sentence itself.  That sending someone to prison isn't a very effective way to deter crime and increasing severities of punishment does little to deter crime.  He will also

suffer significant other punishments in this case, Your Honor.  Some are related specifically to the criminal case, but also related to his agreement with the SEC.

It's a significant loss of reputation, certainly something he will have to work very, very hard going forward to repair.

He's permanently barred as part of his SEC agreement from association with any broker, dealer, investment advisor, municipal securities dealer, et cetera.  What that means for Mr. Nicholas is that he has spent a lot of time in capital in his short life thus far to prepare himself for a career in finance, and that's over.

THE COURT:  Hasn't it been over before this incident?

MS. HOLT:  This is part of it, Your Honor.

THE COURT:  Wasn't he in trouble for something else before this?

MS. HOLT:  Yes, Your Honor.  But that was not a permanent bar the way the agreement with the SEC is.  From any.

THE COURT:  Okay.

MS. HOLT:  There were two different --

THE COURT:  Whatever it was it didn't work.  Whatever it was it didn't stop him from getting involved in this case, correct?

MS. HOLT:  I think they were happening -- I think the sanctions were happening simultaneously, Your Honor.  So I don't think the sanctions were in place and then he disregarded the sanctions and worked with EmpiresX.  I think that had started, the EmpiresX stuff stated, and then he was sanctioned for the prior

conduct.  But it certainly was not an across-the-board prohibition like the agreement with the SEC.  And what that means, as I'm sure you're aware, is that he is done in finance forever and he will have to invest time and capital in a new career, which he has started doing and he will mention to Your Honor as well.

There's also forfeiture and restitution.  By the nature that Mr. Nicholas has the public defender, it's obvious that he does not have significant assets, so he will -- these are burdens, again one that he absolutely should bear for his conduct, but this Court can consider the other forms of punishment that exist beyond just a prison sentence, and those will be significant for him.

Finally, Your Honor, as we already discussed, I think that a sentence of 12 months will avoid unwarranted sentencing disparities.  There are many cases in that table with loss amounts that are incredibly high where they either went to trial or did not exhibit the level of acceptance that Mr. Nicholas has.  And there's not a reason to say that he should get a 51- or 60-month sentence when others with much higher loss amounts have gotten something less.

For all those reasons, I believe a sentence of 12 months is appropriate.

And finally, Your Honor, I would just ask the Court if Mr. Moskowitz could come up and address about what Mr. Nicholas --

THE COURT:  I'm going to listen to Mr. Moskowitz because I respect him, but I don't usually take letters and testimony.  One or the other.

But go ahead.  Come on up.  Come on up to the lectern, Mr. Moskowitz.  Yes, sir.  I read your letter so I know what you said in your letter.  So talk to me.

MR. MOSKOWITZ:  Thank you, Your Honor.  And this is the first time I've ever appeared at a sentencing hearing, so excuse me if I make a mistake or don't do anything --

THE COURT:  We'll try to arrange to have you come in and sit over there, maybe.  I'm just teasing you.

MR. MOSKOWITZ:  I know before our class actions we routinely hear the criminal sentencing, and it really does put our cases in context of how important they are in life.

I was, as I said in the letter, appointed by Judge Fein to be class counsel, so I represent thousands of the victims of EmpiresX, and we entered into a settlement agreement with Mr. Nicholas a few months ago where, in exchange for him giving cooperation for everything he knows and assigning all of the claims that he would have to the class, we would give him a release.  And during those few months he has been incredibly helpful for us.  We have issued numerous third-party subpoenas.  We have filed subpoenas and insurance demands against his former counsel, who his Federal Public Defender spoke about some of the allegations which appear to be horrendous.  In terms of getting paid, he was getting paid by the fraudsters and telling Mr. Nicholas not to do what he wanted to do which was to come clean.  So we will get to the bottom of that claim against him, and that claim is owned by the class.

I could only imagine, Judge, how it is to issue criminal sentencing on defendants.  I can't imagine the burden it is, and I respect the judicial and Justice Department for what they've done.  But I could tell you that in this case, Mr. Nicholas, when we filed our class action complaint which was before the indictment, when I spoke to him on the phone, the first thing he said to me is I made a mistake, I take full responsibility, how can I help the victims.  I don't get that very often.  I never get that.  I never get that in 30 years.  So for selfish reasons I'd love for a defendant to know that if at the point of your life when you can take one road or the other, if you take this one road, there may be some good news down that road.

He's got two little baby girls.  I'm not making any excuses for him.  We sued him.  But I'm saying when he was faced with that road before the government filed their indictment, and I know he was probably nervous about criminal sanctions, but when he was faced with that road and I talked to him personally on the phone, he said I was wrong and I want to do everything I can to help the victims.  And since then he has.  Even from jail he was calling us giving us tips, giving his leads, giving us subpoenas to go after.  So I flew from my vacation with my family to come down here just to put in words.  I'm sorry if I can't appear and do the letter.  I don't know the rules. I just haven't seen it in my experience in 30 years.

THE COURT:  You're not supposed to know the rules.  Better off that way.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

MR. MOSKOWITZ:  I hope so, Your Honor, and I hope this is the last sentencing I ever do come to.

THE COURT:  We always squeeze them in around your cases.

All right, sir.  I appreciate that.

Do you have any questions of him, Madam Prosecutor?

MS. HALLMARK:  No, Your Honor.

THE COURT:  Do you have any questions, Ms. Holt?

MS. HOLT:  No, Judge.  I just want to clarify that there have been additional assets that I believe they've gotten into the receivership based on the information from Mr. Nicholas.

THE COURT:  I'm sure there have.  I believe that.  All right.

Thank you, sir.  Thank you for coming.

MR. MOSKOWITZ:  Thank you.

THE COURT:  All right.  Anything further?

MS. HOLT:  No thank you, Judge.

THE COURT:  Mr. Nicholas, you're welcome to address me. Stay seated.  It's easier to speak into the microphone.  Pull the microphone down and tell me what you'd like to say.

THE DEFENDANT:  Yes, Your Honor.  Your Honor, I prepared a statement here that I'd just like to read.

THE COURT:  Don't read a book to me, because I got plenty to read.

THE DEFENDANT:  It's only half a page.

THE COURT:  That's plenty.

THE DEFENDANT:  Okay.  Your Honor, I deeply regret and I'm ashamed of my legal actions in this case.  I've torn my family apart, ruined my family's name and financially harmed many others.  Truthfully I've been struggling to admit that to myself, but if I'm going to learn to move forward, I have to own what I did, learn from it and do better.

Over the last year I've tried to do all I can to atone for my sin, but I never really admitted it to myself what I had done.  Nonetheless, I feel compelled to just be as blunt and truthful about my role in the crime, what I've learned and what I'm going to do going forward.

I'm humiliated and embarrassed by what I did and the harm I caused, and in September I pled guilty to securities fraud and my pretrial conditions were modified to home confinement.  Since then I've had to sell nearly everything I have just to make my mortgage payment.  The feeling of being confined to my home while my girlfriend cares for our with a two children alone as a single mother with a 20-month and two-month-old has been just tearing me apart these last few months because I've been stuck at home, then went about my situation as if I were a victim of EmpiresX.

And then I thought to myself what if a family owned a restaurant and because of COVID they had no income and they were confined to their home like myself.  They still need to pay rent and they still need to feed their family.  And in a time of need they look to a guaranteed return, and EmpiresX made that guarantee.  I

tried not to think about that, but in some ways home confinement was good because it made me realize the impact I had, and over the long term I think it's going to make me a better person.

While confined to my home, I did take a software engineering class and I secured an internship as a software engineer just last week. Although currently unpaid, it offers me the best chance of leading to a well-paying job where I can earn income to support my family and pay back the victims.

Additionally, I was accepted into a doctorate program here at Florida International University, and they've agreed to delay my entry until August of next year if I'm fortunate enough to have the freedom to attend campus.

And finally Your Honor, Proverbs 14:17 says that a wise man fears the Lord and shuns evil, but a fool is a hothead and reckless.

Going forward, I will turn away from recklessness and fear the Lord and shun evil.

THE COURT: Thank you.

Anything further from the government?

MS. HALLMARK: No, Your Honor.

THE COURT: From the defense?

MS. HOLT: No, Judge. Thank you.

THE COURT: Thank you.

I will tell you that I came into this, despite the government's filing their motion, with the intention of giving him the full 60 months because I thought that the reduction was not

appropriate.  I thought the agreeing to take a plea to the five year maximum sentence was not appropriate.  When I see the victims in this case, I'm not inclined to cut Mr. Nicholas any breaks.  But I do understand, I respect Mr. Moskowitz, I understand what he has said, and I think that does make a very big difference.

I will grant the government's motion for reduction of sentence, and I've considered the statements of all the parties, the presentence report which contains the advisory guidelines, and the statutory factors as set forth in 18 USC Section 3553(a).

It is the finding of the Court the defendant is not able to pay a fine in addition to mandatory restitution.

It is the judgment of the Court that the defendant, Joshua David Nicholas, is committed to the Bureau of Prisons to be imprisoned for a term of 51 months as to Count 2.

It is further ordered the defendant shall pay restitution in the amount to be determined.  Once restitution is determined, during the period of incarceration payment shall be made as follows: If the defendant earns wages in a Federal Prison Industries UNICOR job, then he must pay 50% of wages earned toward the financial obligations imposed by this judgment in a criminal case.  If the defendant does not work in a UNICOR job, then he must pay a minimum of $25 per quarter toward the financial obligations imposed in this order.

Upon release from incarceration, the defendant shall pay restitution at the rate of 10% of monthly gross earnings until such

time as the Court may alter that payment schedule in the interests of justice.  The US Bureau of Prisons, the US Probation Office and the US Attorney's Office shall monitor the payment of restitution and report to the Court any material change in the defendant's ability to pay.  These payments do not preclude the government from using any other anticipated or unexpected financial gains, assets or income of the defendant to satisfy the restitution obligations.  The restitution shall be made payable to Clerk, United States Courts, and forwarded to US Clerk's Office, attention Financial Section, 400 North Miami Avenue, Room 8N09, Miami, Florida, 33128.  Restitution will be forwarded by the clerk of the court to the victims.

Upon release from imprisonment the defendant shall be placed on supervised release for a term of three years as to Count 2.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.  While on supervised release the defendant shall comply with the mandatory and standard conditions of supervised release which include not committing any crimes, prohibition from possessing a handgun or other dangerous device, or firearm or other dangerous device; shall not unlawfully possess a controlled substance, and cooperation in the collection of DNA.

The defendant shall also comply with the following special conditions:  Financial disclosure requirement, no new debt restriction, self-employment restriction and unpaid restitution,

fines or special assessments as noted in Part F of the presentence report.

It is further ordered the defendant shall pay immediately to the United States a special assessment of $100 as to Count 2.

The total sentence: 51 months imprisonment, three years supervised release and $100 special assessment.

The defendant's right, title and interest to the property identified in the plea agreement which has been entered by the Court is incorporated by reference herein and is hereby forfeited.

Now that sentence has been imposed, does the defendant or his counsel object to the Court's findings of fact or the manner in which sentence was pronounced?

MS. HOLT:  No, Your Honor.

THE COURT:  You have the right to appeal the sentence imposed.  Any notice of appeal must be filed within 14 days after the entry of the judgment.  If you're unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis.

The Probation Office has possession of the United States passport of the defendant.  It is ordered the Probation Office is to surrender the passport to the Department of State.

I remand to you the custody of the United States Marshal.

We'll be in recess on this matter.

MS. HOLT:  Your Honor, would you consider adding a recommendation that he be evaluated for RDAP?

THE COURT:  Sure.

MS. HOLT:  Thank you, Judge.

THE COURT:  I will recommend to the Bureau of Prisons that he be incarcerated as close to South Florida as possible, and that he be evaluated for drug abuse and substance abuse problems and if appropriate, recommended to the resident drug abuse program, the RDAP.

Good luck to you, sir.

COURTROOM DEPUTY:  All rise.

(PROCEEDINGS CONCLUDED)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

| 9-6-2024 | /s/ Dawn M. Savino, R.P.R., C.R.R. |
|---|---|
| Date | DAWN M. SAVINO, R.P.R., C.R.R. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**