US District Court Southern District of Florida
Case No 22:20296-CR-Martinez/Becerra

FILED BY MC D.C.

JAN 2 8 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

USA

v

Joshua David Nicholas

—Motion to vacate sentence & restitution order—

1. According to 18 USC 3664(e) and USA v Baldwin 774 F.3d 711,728 11TH circuit 2014 the government bears the burden of demonstrating the loss. In meeting that burden the government must prove actual loss by a preponderance of the evidence attributable to the defendants conduct. USA v Rodriguez 751 F.3d 1244, 1255 11th circuit 2014.

2. Here, Mr. Nicholas claims the government did not meet its burden. Per USA v Cavallo, 790 F.3d 1202, 1239 (11TH Circuit 2015) The method for calculating actual loss, as opposed to intended loss, under the sentencing guidelines is "largely the same" as the method for establishing actual loss to identifiable victims under MVRA. In most cases, the amount of actual loss under the guidelines will be the same as the restitution figure. Thus, it is unsurprising that to prove a victim suffered an actual loss under the MVRA, the government must establish both factual and legal causation in essentially the same manner as it must show causation under the guidelines - by proving but for and proximate causation. See Martin 803 f.3d at 594 USA v Robertson 493 f.3d 1322, 1334-35 (11th circuit 2007)

3. In document 25 paragraph 14(b) it states the "actual loss" was 40.6 million. That document was submitted to the court on 9/8/2022. Then, 6 months later, on 3/3/2023 the government stated actual loss was 3,379,5273.18. According to the law cited in paragraph 2 these amounts should be the same. Yet, they aren't. Therefore, the preponderance of evidence the government relied upon must not have been "reliable and specific evidence" as is required. See USA v Stein 846 F.3d 1135,1156 (11th circuit 2017)

4. Furthermore USSG 2B1.1 instructs one to use the greater of actual loss OR intended loss. Because both the government and probation office made a specific point to use 40.6 million as the actual loss it must have been their conclusion that actual loss was to be used. However, because the actual loss under the sentencing guidelines and actual loss under MVRA are different one can not deny that an error occurred.

5. Because the guidelines instructions are for one to use the greater of actual or intended loss for sentencing; and the fact that the government and PSR both came up with a 22 point enhancement using the actual loss for the offense level calculation to determine the guideline range, it's clear that the offense level was to be made using ACTUAL LOSS. Yet, when the government actually took the time to figure out actual loss they came up with a number less than 10% of their original claim. The law states the actual loss for MVRA and sentencing guidelines is the same but in this case it's not. Therefore, the government did not use reliable and specific evidence. As such, the government did not meet it's burden to justify a 22 point enhancement in Mr. Nicholas's sentence and his restitution order.

6. Furthermore, the government failed to prove factual causation and legal causation to enhance Mr. Nicholas's offense level and restitution amount. The government must prove that investors relied on Mr. Nicholas's fraudulent information to satisfy the "but for" causation requirement under USSG 2B1.1 See also Currie v Cayman Res Corp 835 f.2d 780 785 11th circuit 1988. ("Reliance is .. a type of "but for" requirement" (quoting Huddleston v Herman and MacLean 640 f.2d 534 549 5 circuit 1981 aff/d in part and rev/d in part 459 U.S. 375 103 5 683 74 L Ed 2d 548 1983. The government must also show reliance to prove "but for" causation for restitution purposes. See Martin 803 f.3d at 594. Here the government is basing their claims on victim impact statements and blockchain analysis. However, the government has already proven that blockchain analysis is unreliable. Nevertheless, victim impact statements are such evidence that alone is insufficient to support the reference that "all" investors relied on Mr. Nicholas's false information when deciding to invest. That kind of speculation is forbidden by the Sentencing Guidelines USA v Bradley 644 f.3d 1213 1292 11th circuit 2011 see Sepulveda 115 f.3d at 890-91.

7. Next we address legal causation - The standard for legal causation for purpose of the actual loss calculation is essentially the same under the guidelines and MVRA. See Vivallo 790 f.3d at 1239. As stated before, the guidelines actual loss was 40.6 million but the actual loss under MVRA 3,379,527.18. Clearly there is an error. The government also failed to consider that investors losses could have also occurred as part of the broader "cryptocurrency winter" that occurred during the EmpiresX collapse. Because that impact was ignored the actual losses could also be overstated.

8a. As mentioned in paragraph 3, the preponderance of evidence the court and government and probation office used to rely on must be specific and reliable. Mr. Nicholas claims the government's evidence does not meet that standard. Image for a moment you're a criminal in the business of running a crypto currency token based Ponzi Scheme. A quick SWOT analysis would show

TRULINCS 08943510 - NICHOLAS, JOSHUA DAVID - Unit: COL-B-D

---------------------------------------------------------------------------------------------------

you that the greatest threat would be that all the token transfers would appear on the blockchain giving investors and watchdogs a clear picture of your true intent. So like any experiment in business school you have to come up with a way to transform the threat into a strength.

8b. What's so great about crypto-tokens on blockchain is also what's so terrible. Meaning that only transactions that occur on the blockchain are visible. So if you wanted to make the blockchain a strength all you have to do is only show the world what you want them to see. For example, if investors transfer USDT into your digital wallet you can then transfer those tokens to hundreds of other digital wallets known as using clusters. But let's say these other digital wallets are actually on other exchanges that have no KYC requirement. You can then sell the USDT for BTC and that transaction, because it happens on the exchange, never actually hits the blockchain. In so doing, any potential investor or watchdog would lose their scent.

8c. Even if the watchdog were to subponea the exchange and the exchange wanted to help they coudn't because the exchange doesn't have KYC. Now that the watchdog lost their scent you can now use the blockchain to your advantage. Next, you would want to create ghost social media accounts impersonating real investors. Then pass along fake testimony saying these investors got paid. But in reality, all it is; is you actually transfering tokens from various digital wallets giving prospective investors false positives. After all when they confirm on the blockchain they can see the true "evidence". It's nothing more than a diversion.
                                                                  every

8d. However, making diversions isn't the mission. The mission of this criminal company is to make money. Once potential investors have now verified people got paid by seeing the misleading information you posted to the blockchain they will eventually transfer cryptocurrency tokens into your digital wallet. In so doing you've now cat fished another victim. Theoretically, you could even make fake social media accounts with fake testimony and keep transferring tokens to an ever growing list of digital wallets you control to give the false perception that the company is making 100s millions; when in reality, all you're doing is transferring the same dollar over and over again. As the same dollar is counted over and over again the watchdogs are misled as they don't know it's just a transfer and new victims falsely have misplaced confidence in the success of the company.

8e. In fact, another clear example of this is with the SEC (the main watchdog). But unfortunately, the SEC made an embarrassing mistake that proves they don't have a clue what they are doing. In (Ref A1  ) the SEC quoted one of their "gotcha moments" citing the significant impact Emerson, Flavio, Employee 1, and Jr. had in their original Ponzi Scheme Mining Capital Coin. In the SEC document filled to the court they stated that MCC maintained a list of 65,535 investor accounts. 65,535 is nothing more than a smoke screen number. That number comes from computer architecture. It's the most number of data points 16 bits can store. All that really shows me is that either the SEC downloaded that data from the internet and their hardware his a 16 bit limit OR the SEC got the number from MCC where it was sent as a test to see how far behind the 8 ball the government really is. In either way, the fact that the SEC put that in court for the world to see is embarrassing, and would only serve to give confidence to those in the business of running crypto-currency scams. It's frankly sad.
                                                                  more confidence.
8f. Nevertheless, the point is that the government, SEC, and CFTC don't have a clue what they're doing with blockchain analysis. In Mr. Nicholas's plea they cited 312k as being the tokens directly traceable. That number was false as the true number was 168k. The government said loss was 40.6m then later got 3.4m. In the investigation in MCC they pointed to a false positive. Blockchain analysis requires careful considerations. Not to mention the fact that it's easily hackable. For example, in the early days of BTC it was targeted and hacked frequently. Once the network grew and processing transferred from CPU to GPU the opportunity window for hackers got smaller. With current technology and the size of the network it's practically impossible as the opportunity to locate and intercept the hash is not fast enough. That's because of how computers work. When you make a command on a computer it goes through a series of binary code in a sequence at a very fast speed. That's why when you open an application it takes a split second for the program to open.

8g. But with quantum computing there is no longer a sequence. The computer does every "sequence" at the same time. In other words, once quantum computing becomes mainstream crypto-currency will be the primary target for hackers because the safeguards that make it difficult to hack crypto-currency tokens would now be obsolete. The only way then for BTC to keep relevance would be for the entire network to move to quantum. However, the only way that would be practically possible would be for the entire network to be centralized which is the opposite of the perceived utility value in crypto-currency tokens. The entire market has a fundamental inevitability of Armageddon unless something new changes. As result, this reason is, in part, why Warren Buffet and Charlie Munger have said they would love to put a put with no expiration on BTC - and I agree.
                                                           buy

8h. In summary, the government got their math wrong. As such, the evidence is not specific and reliable. Therefore, the prohibition J sentence should be vacated.

9a. Not only is the list of purported victims amount wrong but the list contains "victims" who are actually co-conspirators. Co-conspirators are not entitled to restitution claims under MVRA. Under USA v Reifler 2nd Cir App. 2006 victims were actually co-conspirators within the meaning of MVRA. As such, the restitution order had to be vacated. In the list of "victims" the government provided they have dozen of persons where the government doesn't even know what country they were from. How can you correctly identify someone if you don't even know what country they're from? Thus, the government did not meet it's burden.

9b. If the government really was getting victim impact statements why didn't they just ask for their location? And wouldn't the victim want to give that information to get their money back ? What's not to say these "victims" actually got paid and are just trying to trick the government to double dip? As the government pointed out, there's no way to identify the owner of a digital wallet and their own use of blockchain analysis is clearly flawed. At a minimum, Mr. Nicholas can identify at least one "victim" who is actually a co-conspirator. Awarding that person restitution only makes a mockery of the judicial process.

10. Finally, the restitution order is already satisfied. 18 USC 3663(b)(5) and in USA v Turner 312 f.3d 1137 9th cir 2002 proved that victims have a right to assign their rights to a third party. MVRA also allows for restitution claims to be settled in exchange for something else. In Mr. Nicholas's case this is exactly what happened. Victims assigned their rights in a class action law suit in Villanueva et al. v EmpiresX corp. et al 010719-CA-01-2022 Complex Business. Mr. Nicholas settled that case. MVRA does not allow victims to recover more than their loss. Victims assigned their loss to the class action lawsuit. That suit was settled. Therefore, the restitution order is settled. As such, the restitution order in this case is in violation of the MVRA and should be immediately vacated.

11a. The court must make these corrections The Supreme Court citing a 2018 publication by the Government Accounting Office recently noted that 90% of restitution orders in criminal cases are uncollectable. See Lags v USA 138 S. Ct 1684,1689, 201 L Ed 2d 1 (2018). In USA v Giltner, 889 F.2d 1004, 1008 (11th circuit 1989) the judge went out of his way to state that a [defendant] has a right not to be SENTENCED on the basis of inaccurate or unreliable information and not required to pay, RESTITUTION [defendant] is not responsible for. In that case there was a multi-million dollar restitution order and even though the defendant didn't contest at the time, the defendant later presented his arguments and the correction amount was less than 1% of the total order. Nonetheless, the judge made clear that the principal holds true. (Emphasis added)

11b. In the case with Mr. Nicholas, both his restitution amount and sentence were made based on inaccurate and unreliable information. That was a clear violation of the law. His sentence and order of restitution should therefore be immediately vacated.

12. At a minimum, Mr. Nicholas's guidelines range should have been corrected for plain error on 3/3/23 once the court recognized actual loss of roughly 3.4 million (Even though that number is also wrong). Had the court and government made that correction Mr. Nicholas's guideline range would have been 37-46 months instead of 70-87. Note that Mr. Nicholas received a downward departure of 51 months at sentencing. However, with the correction, even if Mr. Nicholas got the maximum guidelines range that would have still been less than what he received. Mr. Nicholas has now spent over 2 years in federal prison (not including credit for First Step Act and good time). Even if this court chose to give Mr. Nicholas the guideline max of 46 months Mr. Nicholas would have already over served his sentence.

13. Therefore, Mr. Nicholas prays that the court to order immediately vacate his prison sentence and order of restitution.

Thank You,

Josh Nicholas, MBA
Date 1-22-2025
Signed *[signature]*

I certify that a copy of this was mailed to the government at Sara Hallmark Florida Special Bar No A5502900 Trial Attorney US Depoartment of Justice Criminal Division, Fraud Section 1400 New York Avenue, NW Washington DC 2000599 NE 4th Street.

Ref A1

## A. <u>Summary of the Complaint</u>

The Complaint alleges that the SEC conducted a multiyear investigation of MCC, Capuci, and Pires, dating back to at least early 2020. *Id.* ¶¶ 50-51; DE 9 - Declaration of Larry Brannon ("Brannon Decl.") ¶ 11. The Complaint further alleges that MCC and its founders, Capuci{**2022 U.S. Dist. LEXIS 3**} and Pires, violated the federal securities laws in a scheme to defraud cryptocurrency investors. *See generally* Compl.

Capuci and Pires convinced potential investors that MCC made money through cryptocurrency mining and by trading stocks, foreign exchange, and cryptocurrency on digital platforms. *Id.* ¶¶ 18-25. MCC allegedly generated steady returns through "arbitrage trading" in cryptocurrency, "semi-automatic robotic trading" in the foreign exchange market, and cryptocurrency mining operations in Florida, Vermont, and Iceland. *Id.* ¶¶ 18-19. Investors could tap into MCC's success by purchasing "mining packages," which provided investors guaranteed weekly payouts that escalated in value based on the package price. *Id.* ¶ 26. MCC allegedly offered mining packages with prices ranging from about $125.00 for a $10.00 weekly payout, to $1.2 million for an $84,000.00 weekly payout. *Id.* ¶ 26. MCC and Capuci maintained an investor list showing **65,535** investor accounts. *Id.* ¶ 55.

MCC, Capuci, and Pires relied on a multilevel marketing scheme to bring in new investors. *Id.* ¶¶ 26-30. MCC encouraged investors to act as "sponsors," who would receive commissions amounting to ten percent of sales of mining{**2022 U.S. Dist. LEXIS 4**} packages made by the sponsor to her downline team. *Id.* ¶ 27. MCC promised gifts, including luxury watches and sports cars, to sponsors who proved adept at recruiting new investors. *Id.* ¶ 28. Capuci and Pires promoted the multilevel marketing scheme online and at in-person events across the United States. *Id.* ¶ 29. Defendants made repeated misrepresentations to investors and prospective investors about MCC. *Id.* ¶¶ 48-54. No Defendant was registered with the SEC in any capacity, nor has any Defendant ever registered or tried to register any offering of securities under the Securities Act of 1933 ("Securities Act") or any class of securities under the Securities Exchange Act of 1934 ("Exchange Act"). *Id.* ¶¶ 13-17.

Contrary to what investors were told, MCC never engaged in any trading or cryptocurrency mining at all. *Id.* ¶¶ 51-52. Capuci and Pires testified in 2020 that MCC "never used" its cryptocurrency mining machines because one machine "uses more electricity than the whole building." *Id.* ¶ 50. In testimony on the same topic in 2021 and 2022, they invoked their Fifth Amendment privilege against self-incrimination. *Id.* MCC admitted "that it never had any trading robots and never engaged in any trading." *Id.* ¶ 51. Capuci and Pires invoked their Fifth Amendment right against self-incrimination when questioned{**2022 U.S. Dist. LEXIS 5**} about MCC's trading platform. *Id.*

Defendants made misrepresentations to investors about their backgrounds and MCC's supposed partnerships with organizations like the Clinton Foundation and the World Bank. *Id.* ¶ 49. While MCC told early investors that they could easily liquidate their MCC investments by transferring their assets to a third-party cryptocurrency trading platform, MCC eventually required all investors to withdraw their investments in "CPTL," an MCC-created crypto asset. *Id.* ¶¶ 31-38. Investors seeking to withdraw their MCC assets were required to convert those assets to CPTL, which would be hosted in wallets on a purportedly independent cryptocurrency trading platform called Bitchain. *Id.* ¶ 35. Unbeknownst to investors, Bitchain was created and controlled by Capuci and MCC. *Id.* ¶¶ 15, 39-47. Defendants provided investors false valuations for CPTL and claimed that CPTL holders would soon be able to use the virtual currency at a casino, mall, store, or via a payment app. *Id.* ¶¶ 37-38. The SEC ultimately claims that no one "has ever successfully withdrawn, sold, traded, or otherwise used CPTL." *Id.* ¶ 54. Defendants instead misappropriated much of the funds provided by investors.{**2022 U.S. Dist. LEXIS 6**} *Id.* ¶¶ 55-57.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ref A1

As a result, Defendants "netted at least $8.1 million from the sale of mining packages and $3.2 million in initiation fees." *Id.* ¶ 55. The Complaint and accompanying declarations describe a web of entities and bank accounts controlled by Defendants and used to siphon investors' funds. *See, e.g.,* Brannon Decl. ¶ 13; DE 8 - Declaration of Steven Tremaglio ("Tremaglio Decl.") ¶¶ 5-6, 22, 27, 30, 34-43. Defendants spent millions of dollars on travel, luxury cars, a yacht, and real estate, among other things. Compl. ¶¶ 56-57. Capuci received about $18.5 million in cryptocurrency assets. Tremaglio Decl. ¶¶ 14, 20.

After the SEC issued subpoenas in its investigation, Capuci began to close bank accounts and liquidate a number of assets. Brannon Decl. ¶¶ 93, 96-105, 136. The SEC believes Capuci, who holds both United States and Brazilian citizenship, fled to Brazil with his family on March 25, 2022. Compl. ¶¶ 16-17; Brannon Decl. ¶¶ 11, 135. The SEC believes Pires ended his involvement with MCC sometime in 2020 and currently resides in Brazil. Compl. ¶¶ 16-17; Brannon Decl. ¶ 11.

That's when they jumped & started Empire X

2

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Josh Nicholas
Re) 08943-511
Coleman Low B4
Po Box 1031
Coleman, FL
33521

RECD BY _____ D.C.

JAN 2 8 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

TAMPA FL 335
SAINT PETERSBURG FL
23 JAN 2025 PM 4 L

33128-771899

District
US A Court
Wilkie D Ferguson Jr
406 North Miami Ave, Room 8
Miami, FL 33128

